The City Bank of New Orleans and others *v.* Philip McIntyre and others.

Where notes held by different persons are secured by the same mortgage, no one of them can arrest a sale of the mortgaged property provoked by a holder of another note.   He has no other right to interfere, than to cause the proceeds of the sale to be brought into court for distribution.

The pews in the Roman Catholic Church of St. Patrick of New Orleans, are a distinct property from the church itself, or the ground upon which it stands.   Stat. 16 February, 1842, s. 4.

Where a debtor against whom an execution has been issued, makes no opposition to the manner in which the property is sold, when he might have interfered to prevent it, he cannot enjoin the plaintiff in execution, who purchases the property, from enjoying it pending an action to annul the sale.

APPEAL from the Parish Court of New Orleans, *Maurian*, J.

*C. B. Beverley*, *Hoffman*, *Lockett* and *Micou*, for the appellants.

*Canon*, *Soulé* and *Roselius*, for the defendants.

BULLARD, J. This is an appeal from a judgment dissolving an injunction upon motion, and for want of equity on the face of the papers, which had been obtained by the City Bank of New Orleans and the Roman Catholic Church of St. Patrick, to arrest the proceedings of the defendants, under a judgment against the church, upon a mortgage debt. The correctness of the judgment below depends, therefore, on the question, whether the petition discloses sufficient legal ground for arresting the proceedings of the defendants, the allegations therein contained being assumed as true.

The facts alleged are, that the church issued certain bonds to the amount of $36,000, bearing mortgage upon the church, the lots in New Orleans upon which it is erected, and all its appurtenances. That these bonds have been negotiated to various individuals, of which five, amounting to $5000, belong to the City Bank. That Philip McIntyre is holder of six of the bonds, amounting to $6000, on which he has recovered a judgment. That he has obtained several executions upon said judgment, under one of which he caused to be exposed at sheriff's sale, on the 29th April, 1843, (the present petition was filed January 23, 1844,) the unsold pews in said church, without designating in the advertisement, or at the day of sale, the number of pews so sold, or intended to be sold, and without any reference to the number or situation of said pews, whereby bidders may be informed of their real value, thereby deterring bidders at said sale; and that, by direction of said McIntyre, the pews were sold in lump, and that James McIntyre, the brother of the said Philip, purchased all said pews for $500, on a credit of twelve months, and he claims to be the owner of ninety pews, worth about $500 each. That in October, 1843, under another writ of *fieri facias*, the said Philip McIntyre caused to be advertised all the ground rents due said church upon pews sold to individuals, without designating the number of pews, or to whom sold; and on said sale, by direction of McIntyre, the whole of said ground rents

were offered together in the lump, and bid in by James McIntyre for $600, when, in fact, the annual revenue from said pews was above $1100.   These acts are represented to be oppressive, and in fraud of the rights of the other creditors.   They further show, that James McIntyre, claiming to be the owner, has instituted suits against a number of persons in the court of Gallien Preval, one of the city judges, and is endeavoring to recover judgments against them, as holders of pews in said church, and thus to deprive the church of the income necessary for the support of its pastor, and the payment of its debts.   They further represent, that the said Philip McIntyre has caused to be advertised for sale the four lots on which the church is built, and the improvements thereon, to wit, the church itself, with the exception of said ninety pews and the ground rents; all of which are alleged to belong to James McIntyre, by which exception the whole value of the said premises is destroyed, whereby other bidders will be deterred from attending, and the said McIntyre will be able to obtain said property for a nominal consideration, and the rights of other creditors be defeated.   They allege the nullity of these sales, and to prevent further injury state, that an injunction is necessary.   They further allege, that they have notice that the judgment has been transferred to Mary Louisa McIntyre, who is made a party.   They pray, that the sales be annulled, and that the defendant may be decreed to have no other right against the property than to prosecute his claim concurrently with, and for the joint benefit of the City Bank, and the other bond-holders.

The question whether the sale of the pews and of the ground rent be null, either as it relates to the church or another mortgage creditor, is not before us.   That question remains to be tried upon its merits in the court below.   Our only inquiry is, whether, pending such an investigation of the rights of the parties, the defendants ought to have been restrained from proceeding to sell the lots on which the church is built, or from exercising any acts of ownership as to the pews and the ground rents.

The two parties, plaintiff, stand in different positions towards the defendants in injunction, and therefore their pretensions must be considered separately.   The City Bank is merely the co-creditor, with McIntyre, of the church, their claim being secured by

the same mortgage, and therefore having a right to be paid con-currently out of the proceeds of the mortgaged premises. The church, on the other hand, is the common debtor; as it relates to McIntyre, by mortgage and a judgment in the ordinary form; as to the bank, by mortgage without judgment.

And first, as to the bank. Admitting the right of the City Bank to participate with the defendant McIntyre in the proceeds of their common pledge, it does not follow that they have any other right to interfere than to cause such proceeds to be brought into court for distribution, and not to arrest the sale. The City Bank has no claim on the pews unsold, nor on the ground rents due by those which have been sold. By an amendment of the charter of the church of St. Patrick, passed in 1842, it is declared, that the purchasers of pews in fee simple shall hold them forever free from any liability for debts, and that they shall never be sus-ceptible of any species of mortgage, and that the sale of such pews need not be recorded. Acts of 1842, p. 128. The pews are therefore a distinct property, and when owned by an individ-ual, not liable to be seized for his debts. They are quite distinct from the church, and the ground on which it stands. If the church wardens had sold every pew after the date of the mort-gage of the contending parties, it would not have impaired their hypothecary rights. The bank, therefore, has no right to com-plain of the manner in which the pews have been sold by the sheriff.

How does the matter stand in relation to the church ? That corporation complains with ill grace of what might have been prevented by themselves. They knew the number of pews unsold, and can gain no advantage by concealing their know-ledge from the defendants. They might have had a fair sale, pew by pew, by interfering for that purpose. There is no equity in their lying by until the pews were sold, and then com-plaining of an irregularity caused in a great measure by them-selves. They do not now aver, that either more or less than the true number was sold. The defendant sold without opposition from the church. The corporation might have purchased the pews and the ground rents, at the second exposure, on a credit of twelve months. They chose to forbear that advantage which

the law allows to judgment debtors. The defendants having purchased, were entitled in the meantime to enjoy the advantages of their purch se, and to enjoy the property as owner.

While we concur with the Parish Court in the opinion that the injunction ought to be dissolved, we think the damages awarded under the act of 1831 and 1833 excessive, considering the very short time that the proceedings of the defendants have been wrongfully suspended. The injunction was obtained in January, 1844, and was dissolved on the 12th of April. The debt itself bears an interest of eight per cent, and no special damages are shown. Under these circumstances, we think two per cent interest per annum, and damages at five per cent, are a sufficient remuneration.

The judgment of the Parish Court, so far as it dissolves the injunction with costs, is affirmed, and so far as it awards damages and interest, it is hereby reversed; and it is further ordered, that the defendants recover of the plaintiffs in injunction and their surety, *in solido*, interest at two per cent per annum, and damages at the rate of five per cent; and that the appellees pay the costs of the appeal.*

---

* *Lockett* and *Micou* for a re-hearing. By an act of the Legislature, approved March 10th, 1840, the trustees of St. Patrick's Church were permitted "to borrow money on mortgage of their property." In pursuance of the power thus given, they issued a series of bonds, and granted a mortgage, to secure their payment, upon four lots of ground, "together with the new church and improvements being erected thereon, and all the appurtenances thereunto belonging."

Philip McIntyre being the holder of six of these bonds for one thousand dollars each, and the interest being in default, brought a suit against the church and recovered a judgment. Under the second writ of *fi. fa.* issued on such judgment, he advertised for sale, "Ninety pews more or less remaining unsold," without any other description. The appraised value not having been offered at the first bidding, they were sold, *in the lump*, at the second bidding, to James McIntyre, the brother of the plaintiff, for five hundred dollars at a credit of twelve months.

Under another execution, the plaintiff caused to be sold the *ground rents* of the pews previously sold by the trustees, amount-

ing annually to more than one thousand dollars, and James Mc-
Intyre became purchaser, *in the lump,* for six hundred dollars
cash.   The plaintiff in execution was further proceeding to ad-
vertise and sell the four lots of ground, the church and its appur-
tenances, reserving the rights of James McIntyre acquired under
the previous sales, when his progress was arrested by an injunc-
tion granted in the suit now before the court.   The City Bank
and others, holders of bonds of the same series and secured by
the same mortgage with the bonds of P. McIntyre, unite in the
prayer for injunction and relief.

It is important to inquire into the nature and extent of the rights
conferred by this mortgage upon the holders of these bonds.
The church was built under the sanction of a previous act of in-
corporation, and dedicated as a place of worship.   Before the act
of mortgage was passed, sundry pews had been sold to indivi-
duals, subject to a ground rent, or more properly an assessment
of two per cent per annum upon the price, for the support of the
curate and other expenses of the church.   The property in the
unsold pews vested in the trustees, who also received and admin-
istered the rents of those that had been sold.   The mortgage
consequently embraced the lots, the church, the unsold pews and
the rents, subject to the charges to which they were subject in
the hands of the trustees.   The property is all *real* in its nature,
or issuing from the realty.   The pews form a part of the
church ; the rent grows out of their use and enjoyment, like the
rent of other houses or lots.   The mortgage of the principal
embraces the accessories and appurtenances.   Civil Code, arts.
3249, 3278.

But the owners of the pews sold before the mortgage, have an in-
terest in their pews distinct from that represented by the trustees,
and consequently not embraced in the mortgage.   Each pew-hold-
er has an undivided right in the use and enjoyment of the church,
and a distinct and separate right to the use of his pew.   These
rights require, that the whole property be preserved in its present
condition.   The church must stand, and a space around it con-
tinue open for light and ventilation.   The lots described in the
mortgage, form at best a contracted space for such an edifice ;
not a foot of it could be appropriated to any other purpose with-
out interfering with the enjoyment of the pews and the solemnity
of worship.   Nor can any other use be made of the property du-
ring the recess of religious service.   The Catholic Church is al-
ways open to the believer ; and even were it otherwise, to turn
the church into a place of traffic, is a desecration forbidden by
propriety.

The individual right of pew-holders is to use the pews ; the
corporate right attaches to the property in the lots, building and

rents. The mortgage embraced the property vested in the trustees, not the rights previously granted to pew-holders. The pews remaining unsold were embraced, and, after the mortgage, could not have been sold without infringing the rights of the mortgage creditors. The rents like those of other houses are enjoyed by the mortgagor, until sold under the mortgage, and then pass to the purchaser as part of the issues and profits of the property. If we were to suppose, on the contrary, that the mortgage did not embrace the pews and rents, but only the naked property in the lots and church, subject forever to the use of others, the mortgage would be a mere mockery, covering an interest so remote and contingent, that its value would be imperceptible.

Such being the rights conferred by the mortgage, we come to the question, how can they be legally exercised ; or, in other words, how the mortgage is to be foreclosed ? The act of mortgage gives to each bond-holder the right of proceeding separately, but he must also proceed legally ; otherwise, in exercising his own rights, he will infringe those of others.

The rights of the pew-holders under titles of date anterior to the mortgage, cannot be destroyed by the mortgage; the assessment cannot lawfully be diverted from its object and made the source of private emolument ; nor can the other pews be sold without imposing upon the purchasers an assessment equivalent to that borne by the other owners of pews. This burthen is imposed not as a debt of the pew-holders, to be paid at all events and to any one holding a transfer of the right, but as a means of support to the curate, and of defraying the other expenses of the church. If the revenue is withdrawn, the services must cease for want of support. If the services cease, the rents are no longer due, the consideration on which they were promised having failed. The trustees could not sell the pews without reserving rents, nor could they divert from their legitimate object the rents reserved. The power to do either, involves the power to change the destination of the property.

Upon the principle, that the trustees could not give to others more than they themselves possessed, the limit of the powers of the trustees must be taken as the limit of the rights of the mortgagees. The legitimate effect of the mortgage is, to enable the creditors by sale to give to the purchaser the title of the trustees. Then the only regular and legal foreclosure under the mortgage would consist of the sale of the entire property, lots, church, pews and rents. The purchaser at such sale would stand in the place of the trustees ; he would succeed to the administration of the temporal interests and revenues of the church, subject to the burthens imposed by the charter, by the contracts with pew-holders, and by the dedication of the property to religious worship.

We will now consider whether, in case one of the bond-holders proceeds to sell the property subject to common mortgage in an irregular or illegal manner, the other bond-holders have not the right to require the rescission of the sale. We contend that they have. If by an unusual or irregular proceeding, the property mortgaged is converted to the exclusive use of one of the creditors, the rest certainly sustain an injury. Does the law give them no remedy? The common law maxim is, where there is a right there is a remedy. Our courts uniformly act upon the same maxim; and it is in effect adopted by the code, which enjoins upon the judges to decide according to the principles of equity, when there is no express law. There can be no failure of justice for want of express regulation. But the law expressly says, that the property of the debtor is the pledge of his creditors; and the courts constantly act upon and enforce the maxim. In this case, the maxim is doubly applicable, for the parties have adopted by their convention the rule prescribed by the law. By accepting bonds under the same mortgage, they have voluntarily assumed an equal position.

The law further declares, that any creditor may be relieved from a contract in fraud of his rights, made by a debtor. Any species of contract or contrivance, whether executed by private agreement or judicial sale, the object of which is to give to one creditor a preference over others, or to withdraw property from the pursuit of creditors, comes within the prohibition of the law. If by collusion between the plaintiff and defendant in execution, the property of the latter be sold by the sheriff, in an unusual or informal manner, in order to enable the plaintiff or *his brother* to buy it at a sacrifice, other creditors injured by the fraud, could cause the sale to be annulled. *Muse, syndic,* v. *Yarborough,* 11 La. 530. If, without the concurrence of the defendant in execution, the plaintiff procures the property to be sold in a manner to deter all bidders but himself, and secure the property at his own price, does not the same rule apply? The injury is the same, and *eadem ratio eadem lex.*

So long as the seizing creditor keeps within the strict bounds of the law, the loss resulting from his process is *damnum absque injuria,* and no one has the right to interfere. Other creditors can only claim a participation in the proceeds of the sale, according to their respective rank and privilege. But if the proceedings be illegal, and the property is consequently sacrificed for a nominal consideration, the recourse upon the proceeds of sale no longer fills the measure of impartial justice. The sale must be set aside, or else redress is refused for a wrongful injury.

The case of *Merwin* v. *Smith,* 1 Green's Ch. Rep. 182, was a

suit brought by junior judgment creditors to set aside the sale of property made under older judgments. The averments of the bill are set out at length in the report, and it contained no charge of collusion between the debtor and the seizing creditor. The illegalities consisted, among others, of selling the property in such parcels that it was greatly sacrificed. The court, speaking of the right of the complainants to maintain their suit, says ; "The complainants being judgment and execution creditors, stand in a position which fully entitles them to be heard, and if the sale made by the sheriff is in any manner illegal, it may be set aside at their instance." We are not aware of the precise point having arisen in this court, but this decision is so reasonable in itself, and coincides so perfectly with the spirit of our codes, that we think the court cannot hesitate to adopt it as sound law.

We come to the conclusion, that the mortgage creditors are entitled to demand the rescission of an illegal sale ; and we will now proceed to inquire whether the church has not the same right.

By referring to the transcript of the case of *McIntyre* v. *St. Patrick's Church*, the court will perceive, that the plaintiff made an attempt under the first writ to recover his money by garnishment in the hands of Messrs. Mullon, Stringer and Donlin. Interrogatories were propounded, and separately and distinctly answered by each of the garnishees. No interrogatory inquired as to the number of pews sold previous to the date of the mortgage, the persons to whom sold, or the amount of rents due by each. No inquiry was made as to the number remaining unsold, or their relative value, or position in the church. Nothing being made by garnishment, McIntyre took a new writ, and levied upon and sold the pews remaining unsold, "ninety more or less," as complained of in the petition. Under another writ, the ground rents, without any designation, were sold. It does not appear by the record, that any effort whatever was made to ascertain the position or number of the pews, or the names of the pew-holders. Whether such an attempt was made out of court, by application of the plaintiff in execution or the sheriff, the counsel now appearing do not know, not having been at that time in the cause. But the court must presume, that records were kept of the numbers of the pews, of their sale and rents. The keepers of these records were within the control of the court ; and its process could have been invoked successfully, to procure the proper information. It is then apparent, that the plaintiff in execution used no *legal* diligence to discover, identify and describe the property which he proposed to sell.

Under these circumstances, if irregularities occur by which a defendant is greatly injured and his property sacrificed, is he remediless, because he has not interposed to prevent the sale ? Is

he bound, under the penalty of submitting to whatever loss may have occurred, to volunteer information, and to assist the plaintiff in conducting the sale ? We respectfully submit, that he is not. The defendant in execution is often unable to give the security necessary to stay a sale. After final judgment, he is in the hands of the law ; but while the law exacts strict justice, it requires that justice to be tempered with mercy. In placing its writ and its officers at the disposal of the plaintiff, the law does enough to secure his just rights. It would be hard, indeed, if the defendant were to suffer from any abuse of the powers entrusted to the plaintiff. Equity does not assist him in covering the illegal or oppressive use of process in his hands. He proceeds at his own peril. If the sale be regular and fair, the property passes ; if not, there is no alienation, and the rights of the defendant are not divested. *Dufour* v. *Camfranc*, 11 Martin, 610. *Delogny* v. *Smith*, 3 La. 421.

No exception is admitted to this rule in consequence of the defendant being notified of the sale. His right to question judicially its validity can only be lost by being expressly waived. Mere *laches* does not bar *a claim ;* there must be fraudulent dealing or acquiescence. Drewry on Injunction, p. 38, Law Library, vol. 36. The same principle applies to a right. Its relinquishment is not presumed ; it is not lost by mere inference. A defendant does not lose his right of appeal, by joining in the sheriff's sale of his property under the execution. *Prentice* v. *Chewning*, 1 Robinson, 72.

In *McDonogh* v. *Gravier's Heirs*, 9 La. 543, it appears, that execution having issued against Gravier, he surrendered a number of squares and lots to be sold, and furnished a plan on which they were designated. The plan being found incorrect, another was made by the city surveyor at the instance of the purchasers, but as Gravier refused to ratify this plan, the purchasers were left in as great uncertainty as before. Another sale took place under a subsequent execution, one object of which was to perfect the title acquired by the first sale, which Gravier made no effort to prevent. His heirs were notwithstanding permitted to treat this sale as a mere nullity. They were proceeding to sell the property, when McDonogh, the purchaser, enjoined them, and claimed the property as his own. His demand was dismissed.

The case of *Zacharie* v. *Winter*, 17 La. 79, came up on an opposition to a monition. The sale was attacked for irregularities or causes previously existing ; the principal of which was, an act of retrocession, to which the defendant was a party. He was notified of the appraisement on the day of sale, but made no effort

to prevent it. The court did not hesitate, at his instance, to annul the sale.

The same principle prevails in Pennsylvania. In *Rowley* v. *Brown*, 1 Binney, 61, the defendant was relieved from a sale on a rule to show cause. But on this point we think it unnecessary to cite further authorities. The theory of the monition law and of short prescription against informalities of judicial sales, is based upon the principle, that the neglect of a defendant to interfere and stop the sale does not deprive him of his right to demand its rescission. His waiver of formalities would bind him like any other contract, but mere silence or inaction has never been held sufficient to destroy either his legal or equitable rights.

Having thus established that no considerations either of equity or of law have barred the door of justice to the church or its creditors, we come to the questions upon which the judgment of the court is to be rendered.

The injunction only is now before the court.

The prayer of the petition is, that the sale of the pews and ground rents be set aside as null ; that the purchaser be prohibited from exercising any acts of ownership over them, and that until the trial of this suit, the sale of the church and lots be stayed. A successful rule having been taken in the court below to dissolve the injunction, it is now the province of this court to decide in the last resort, whether the injunction shall be provisionally maintained.

The rule is taken upon the ground, that the petition discloses no legal cause for an injunction. Such a rule is in the nature of a demurrer, and takes the facts in the petition disclosed to be true. Although the case is not before the court for final decision, the merits, as shown in the petition, must necessarily be considered.

On an application for an injunction, the merits may be entered into so far as disclosed by the bill, but no extraneous matter can be introduced. *Rose* v. *Hamilton*, 1 Desaussure, 137.

The case of *Merwin* v. *Smith*, 1 Green's Ch. Rep., already cited, was before the court, as this case is, upon a rule to dissolve an injunction. The object of the injunction was to prevent titles being made and possession taken under a sheriff's sale. The motion to dissolve was made on filing the answer. The court had to decide upon the equities of the parties as shown by the pleadings ; and being satisfied that a *prima facie* case of nullity was made out, maintained the provisional injunction.

To support a motion for an injunction, the bill should set forth a case of probable right, and probable danger that the right will be defeated without the interposition of the court. *State of Georgia* v. *Brailsford*, 2 Dallas, 405.

If the allegations of the petition, when supported by proofs, will entitle the party to the ultimate relief demanded, he must receive the protection of the court until the trial. If grounds are shown sufficient to annul a title, there is just reason to prohibit the intermediate enjoyment of the property—if for a perpetual injunction against a sale, the provisional injunction must be granted of course. Although the decree of the court will not be the same, the case is before it on precisely the same principles as if the defendants had filed their answer, admitting the facts charged to be true, and resting solely upon the law. We therefore proceed to consider, whether the allegations in the petition admitted to be true, entitle the complainants to the relief demanded in its prayer.

If the view we have already taken of the rights conferred by the mortgage and the manner of enforcing it be correct, the proceedings under the execution are radically defective. Rents stipulated only for a special purpose, are attempted to be severed from the property to which they belong, and are claimed free of the services in consideration of which they were promised. Pews attached to the freehold, and susceptible of alienation by the mortgagor, only with the reservation of a rent to fulfil the objects of dedication, were sold and are claimed to be enjoyed free of any charge whatever. But even if the pews and rents be admitted to be liable to the execution, we contend that the proceedings under it have not divested the title of the church.

The sales are void because they were oppressive.

If the pews and rents could be sold separately from the church, there is no legal mode of disposing of them, except in detail. The sale of such objects in gross is ruinous to the defendant. It is a violation of the maxim, *sic utere tuo ut alienum non lædas*, and of the Christian principle adopted in our code, "not to do unto others that which we would not wish others to do unto us."

The pews are alleged in the petition to be worth five hundred dollars each. McIntyre claims to be the owner of some " ninety, more or less," for the price of one. The ground rents stated in the advertisement to amount to one thousand dollars per annum, are claimed for the nominal consideration of six hundred dollars. If the notice of seizure had not been served, or the advertisement had been one day too short, the sales would be null. *McDonogh* v. *Gravier*, 9 La. 543. *Grant and Olden* v. *Walden*, 6 La. 628. Yet these are mere formalities, the neglect of which lead to no certain injury, while such a sacrifice of the property of a defendant is directly ruinous. A plaintiff is neither permitted to sell more of the defendant's property than is required to satisfy his demand, nor to sell it in a manner to ensure its sacrifice.

In the case of *Stead's Ex'rs* v. *Course*, 4 Cranch, 414, the de-

fendant relied upon a collector's sale of 450 acres of land for taxes. The law authorized the sale of "the land of the defaulter, or so much thereof as will pay," &c. C. J. Marshall said ; "If a whole tract were sold, when part of it would have been sufficient, the collector unquestionably exceeded his authority."

In the case of *Tiernan* v. *Wilson*, 6 Johns. Ch. Rep. 413, Chancellor Kent says ; "The proposition is not to be disputed, that a sheriff ought not to sell at one time more of the defendant's property than a sound judgment would dictate to be sufficient to satisfy the demand, provided the part selected can be conveniently, and reasonably detached from the residue of the property and sold separately. The justice of this rule is self-evident." After citing cases in point, he proceeds ; "The rule must be the same without any positive law for the purpose. It rests on principles of obvious policy and universal justice."

If, in answer to these cases, it is said that the result of the sale shows that too much property was not sold, we answer, that a sale thus conducted is no criterion of value, and that in both of the cases cited, valuable property was sold for a mere nominal price. Pews are not objects of commercial speculation. Those who buy them usually wish to use them, and no man wishes more than one or two. Their value depends greatly upon their position in the church. By selling without designating their position, and in gross, those likely to bid are driven from the stand. So of the rents. Their value must depend upon the responsibility of the pew-holders. To know what the rents are worth, their names ought to be disclosed. By selling them separately, the owners of pews would be induced to bid for the rents due by themselves. The sale in gross puts down competition, and is as wasteful of their value as was the sale of the pews.

But let us look a little further into the views of other courts, as to the duties of sheriffs in disposing of the property of debtors.

"A party who has power to sell, is not bound to sell at once all the property ; and in many cases it would be an act of great oppression to do so." *Hewson* v. *Daggert*, 8 Johns. 335.

"It is a rule of this court to disallow in every case a lumping sale by the sheriff, where, from the distinctness of the items of property, he can make distinct sales. It is essential to justice and to the protection of unfortunate debtors, that this should be the general rule ; any other would lead to the most shameful sacrifice of property." *Rowley* v. *Brown*, 1 Binney, 61.

The case of *Merwin* v. *Smith*, 1 Green's Ch. Rep. 196, was in many points analogus to the one under consideration. The property of the defendant had been sold in large parcels and under vague and imperfect descriptions, although it does not appear from the report, that the plaintiffs directing the sale became pur-

chasers. They had therefore more equity on their side than the McIntyres in this case. The chancellor said; "This wholesale method of disposing of a defendant's property can never be justified upon any other ground than as being the best mode for making it bring the most money. A property indeed may be so circumstanced, one part so dependent upon the other, as to require a sale in large parcels; but the general rule is, that it must be sold in different parcels if plainly divisible."

In *Woods* v. *Monell*, 1 Johns. Ch. Rep. 505, Chancellor Kent says; "I have no doubt of the value and solidity of the rule, that where a tract of land is in parcels distinctly marked for separate and distinct enjoyment, it is in general the duty of the officer to sell by parcels, and not the whole tract in an entire sale. To sell the parcels separately is best for the interest of all concerned. The property will produce more in that way, because it will accommodate a greater number of bidders, and tends to prevent odious speculations upon the distresses of the debtor."

The subject from its nature is not susceptible of positive and uniform regulation. A sale by injudicious divisions of one property would be as ruinous, as a sale in gross of another, that ought to be divided. Hence the law imposes upon its officer the duty of exercising a sound and reasonable discretion, both as to the amount of the property seized, its appraisement, and sale. Code of Pract. arts. 651, 676. Whether the property be real or personal, makes no difference, because the reason as to both is the same. The object of the law is to prevent injustice and oppression, and to secure the highest price. The code itself requires, that the property be appraised with such minuteness, that it may be sold together or separately to the best advantage of the debtor, as he may direct. If the debtor does not attend the appraisement and sale, his interests are left in the care of the sheriff, and the court will see, that that officer exercises fairly and impartially the discretion which the law has given him. These principles were recognized by this court in the case of *McDonogh* v. *Elam*, 1 La. 492, and in the case of *McDonogh* v. *Gravier's curator*, 9 La. 531.

The sales are void for uncertainty. The number of pews intended to be sold is not stated with precision. They were advertised and sold as "ninety pews more or less." A hundred might be claimed, or if only fifty remained unsold, the sheriff would call for no more. No designation is given of their number, and without extrinsic evidence, the purchaser could not prove title to any single pew in the church. His title is a kind of floating grant; nor would the law lend its assistance in locating it. It is essential to the validity of a grant that the thing

granted be so described as to be distinguished from other things of the same kind. *Blake* v. *Doherty*, 5 Wheaton, 359.

The advertisement for the sheriff's sale is intended to attract bidders and secure a fair price. The description must be sufficiently definite to inform the public as to the precise property to be offered for sale. In *Carmichael* v. *Aiken's Heirs*, 13 La. 207, this court held, that the designation of a lot by its number of the square and the name of the fauxbourg was insufficient; and in *McDonogh* v. *Gravier*, that all the right, title and interest of the defendant in property between four streets was too indefinite.

The Supreme Court of the United States, in the case of a sale for taxes, decided, that in the advertisement, "the property should be so definitely described that no purchaser could be at a loss to estimate its value." "If the purchaser at the sale had been informed of every fact necessary to enable *him* to fix a value upon the property, yet the sale would be void, unless the same information had been communicated to the *public* in the notice." *Ronkendorff* v. *Taylor's Lessee*, 4 Peters, 362.

Even judgments are reversed for uncertainty. The law will not permit the party cast to be exposed to an arbitrary discretion on the part of the officer charged with their execution. *Thomas* v. *Baillio*, 7 La. 410.

Nor is the purchaser relieved by the production of proofs or documents not referred to in the notice. The offer to produce them is evidence of the unfairness of the sale, for the court will infer that the purchaser bid upon knowledge not communicated to the public. If the purchaser and the plaintiff were brothers, the presumption would be strengthened, because the plaintiff directs the advertisement.

The sale of an undivided interest in an estate, referring to the inventory for description, was held to be null. The court said; "This loose proceeding is not a compliance with the statute, and the title to the estate is not affected by it." *Tate* v. *Anderson*, 9 Mass. 95. "The effect of those proceedings, is to be determined by the sheriff's return, which is not to be supplied or contradicted." "An uncertainty or mistake in any circumstance, essential to a sufficient description of the estate extended upon, or an omission from the return of any essential requisite in the proceedings directed by the statute, is fatal to the title and renders the extent void." *Bott* v. *Burnell*, 11 Mass. 165.

The same principles and authorities apply to the sale of the rents, and we think establish, that both sales are void for uncertainty.

The petition alleges "the sale of the ground rents and pews to be utterly void, as well by reason of the uncertain and insufficient description thereof, as for divers other informalities in the

proceedings before and at the time of the sale." To this allegation no exception is taken, and the rule to show cause admits it to be true. Then there are other informalities. The complainants have the right of showing them on the trial of the cause. How shall this court say that they are not sufficient to vitiate the sales?

Some of these may be pointed out at once from the record. The sheriff's return will show, that the ground rents were never properly seized. Such property can only be seized by taking possession of the title, or giving notice to the debtor. Civil Code, arts. 2457, 2612–13. This court has very lately decided, that the plaintiff acquired no right by a seizure, unless the sheriff took possession of the property. *Goubeau* v. *New Orleans and Nashville Rail Road Co.*, 6 Rob. 345. And in case of a debt, unless he took possession of the title. *Simpson* v. *Allain*, 7 Rob. 500. A sheriff must seize the property he sells, and have it ready to show or point out to the purchaser, &c. *McDonogh* v. *Elam*, 1 La. 491.

The petition, therefore, does afford grounds sufficient to cause these sales to be annulled. But if it offered only probable grounds of nullity, according to the cases already cited, (*Rose* v. *Hamilton, State of Georgia* v. *Brailsford*, and *Merwin* v. *Smith*,) it would suffice to maintain the injunction until trial. Does not the petition afford ground for staying the sale of the church?

The sale of the lots, church, and appurtenances would include the pews and rents. Civil Code, art. 2466. The sale of a theatre would include the boxes. These are not merely accessories, they constitute in fact the beneficial interest which gives value to the property. If no part of the pews had been sold, the purchaser of the church would acquire the whole property and might change its destination. If pews had been sold to others, the purchaser of the church would take their rents, subject to the agreement on which they are to be paid. The sheriff's sale regularly made would confer similar rights.

In the sale which has been arrested by injunction, the plaintiff proposed to sell the church, *with the reservation of the rights of James McIntyre to the pews and rents.* Let us see what is the effect of this reservation. We have endeavored to show, that James McIntyre acquired *no rights.* If we have succeeded, the reservation is null, it must be considered as not written, and the purchaser would take the same interest as if no such reservation had been made. But their invalidity is not yet pronounced; it is only in litigation. If his title to the rents and pews be maintained, the purchaser of the church would take nothing but a naked and valueless interest; if the title be set aside, the purchaser would acquire the pews and rents as a part of the church.

A bid under such circumstances, would be a mere speculation upon the chances of McIntyre's defeat. Bidders would again be driven away by the fear of litigation, and the plaintiff be enabled to acquire the remaining interest for a nominal consideration. The suit for annulling his former purchases would be extinguished by confusion ; for if his 'old title were set aside, he could retain them under the new. A plaintiff in execution would thus be permitted by one judicial sale to cast a cloud upon the title of the defendant, and by a second sale to turn the doubt to his profit, by destroying competition, and acquiring at a sacrifice, rights which he had made valueless to all others than himself.

If an injury is thus to be inflicted upon the church and its creditors, the proper mode of preventing it is by injunction.. The broad provisions of the. Code of Practice, arts. 298 and 303, give ample powers to the court to prevent illegal action, under an execution, or to prevent any act injurious to the party claiming the interposition of the court. These articles confer preventive powers as extensive as those exercised by courts of chancery. We will, therefore, refer to a few cases and authorities showing the principles upon which those courts grant relief in cases analogous to this.

"A court of equity will control and regulate proceedings on a mortgage so that no injustice be done to either party." "It will require property to be sold in lots or together, as best calculated to bring the highest price." *Suffern* v. *Johnson,* 1 Paige Ch. R. 450.

"Equity will restrain the doing any act, by which irreparable damage may be occasioned." *Putman* v. *Valentine,* 5 Ohio Rep. 117.

"Injunction will be granted to prevent a party making use of a legal writ, for the purpose of vexation and injustice." *Colt* v. *Cromwell,* 2 Root, 109.

"Any fact which proves it to be against conscience to execute the judgment, will be ground for an injunction." *Marine Ins. Co.* v. *Hodgson,* 7 Cranch, 332.

"As the court sometimes exercises its jurisdiction for the purpose of removing a cloud from the complainant's title to real estate, it may also, in a proper case, interpose its authority to prevent the illegal act from which such a cloud must necessarily arise." *Oakley* v. *Trustees of Williamsburg,* 6 Paige's Ch. R. 265.

"The jurisdiction of this court to set aside deeds and other legal instruments, which are a cloud upon a title to real estate, and to order them to be delivered up, appears now to be fully established. If the court has jurisdiction to set aside a sale, &c., it seems to follow that it may interpose its aid to prevent such shade being cast upon the title, when the defendant evinces a fixed de-

termination to proceed with the sale." *Pettit* v. *Shepherd,* 5 Paige Ch. R. 501.

In the case of the *Bank of the United States* v. *Schultz,* 2 Ohio R. 506, the court was unanimously of opinion, " that an injunction should be granted to prevent a sale under execution, where such sale would not at law confer a title upon the purchaser, and its only consequence would be to embarrass the title of the complainants." The same principle is recognized in the same court in the case of *Norton* v. *Beaver,* 5 Ohio Rep. 179.

The general principles upon which courts of equity are governed in such cases, are well stated by Judge Story; "Injunction is granted upon the sole ground that from certain equitable circumstances, of which the court has jurisdiction, &c., it is against conscience that the party inhibited should proceed. The object therefore really is to prevent an unfair use being made of the process of a court of law, in order to deprive another party of his just rights or to subject him to unjust vexation." 2 Equity Juris. § 875.

" Indeed the occasions on which an injunction may be used to stay proceedings at law, are almost infinite in their nature and circumstances. In general it may be stated, that in all cases where by accident, mistake, fraud or otherwise, a party has an unfair advantage in proceeding in a court of law, which must necessarily make that court an instrument of injustice, and it is therefore against conscience that he should use that advantage, a court of equity will interfere." Ibid. § 885.

The organization of our courts relieves us of the necessity of appealing to one for relief from the process of another, but the principles on which such relief is granted are the same as in chancery. What these principles are, we have endeavored to show by numerous references to the decisions of this court and of others, whose opinions together form the highest sources of the jurisprudence of our country. If the proceedings of a plaintiff in execution are irregular and oppressive, they should be stayed. If an apparent title to property has been acquired, from which no profit can result to the claimant, but which occasions embarrassment to the owner, that title will be set aside. If such apparent title, created by one sale, be used to prevent competition at another, the second sale will be prevented. In each and all of these cases, if set forth with proper allegations, and supported by affidavit, an injunction will be granted and maintained until the trial of the cause.

Whether the pleadings present such a case to the attention of the court, and whether the ends of justice will be most promoted by

dissolving the injunction with damages on the one side, or by maintaining it provisionally on the other, the court is now to decide.

*Re-hearing refused.*